394 P.2d 423

**John Edward FITZPATRICK, Appellant,**

**v.**

**BOARD OF MEDICAL EXAMINERS of the State of Arizona, Appellee.**

**No. 7329.**

Supreme Court of Arizona.

En Banc.

July 21, 1964.

310

Jack C. Cavness and Walter W. McMillen, Phoenix, for appellant.

Robert W. Pickrell, Atty. Gen., and Charles T. Stevens, Sp. Asst. Atty. Gen., Phoenix, for appellee.

LOCKWOOD, Vice Chief Justice.

Dr. John Edward Fitzpatrick, appellant, applied to the Board of Medical Examiners of the State of Arizona, hereafter designated as Medical Board, for a license to practice medicine. The Medical Board denied his application on the ground that he was guilty of unprofessional conduct in that he practiced medicine without a license in the State of Arizona in violation of § 32–

1456 A.R.S.[1] Dr. Fitzpatrick petitioned the superior court for a review of the action of the Medical Board pursuant to § 32-1453 A.R.S. The petition sought a reversal of the action of the Medical Board on the grounds that (1) its decision was unsupported by competent material and substantial evidence in view of the entire record, and (2) that the decision was arbitrary and capricious. The matter was submitted to the superior court on motions for summary judgment. The court granted the respondents' motion and entered summary judgment for the Medical Board. The petitioner thereupon appealed.

The facts appear as follows: The White Mountain Communities' Hospital, Inc. Board of Directors, hereafter designated Hospital Board, desired to open a hospital at Springerville, Arizona. In order to take advantage of a promised donation of $10,000, it was necessary that the hospital be opened by July 1, 1960. Merle Harper was President of the Hospital Board. R. V. Vandiver was the hospital administrator hired by the Hospital Board. It was necessary to secure a medical doctor to operate the hospital. Since there was no medical doctor in the area which the hospital would serve, the Hospital Board instructed the administrator to contact and hire a doctor. The administrator contacted Dr. John Edward Fitzpatrick, who was a licensed medical doctor practicing in Clovis, New Mexico. Early in June of 1960, Dr. Fitzpatrick made application for a license to practice in Arizona. In the latter part of June, the doctor came from New Mexico to Springerville, but did not then enter the practice of medicine there. Sometime before July 1st he telephoned Dr. Roy Young a member of the Medical Board who was in Flagstaff, Arizona and asked what could be done to expedite the obtaining of a license or temporary license. Dr. Young told Dr. Fitzpatrick: "Don't touch a patient until you get your license." Thereafter Dr. Fitzpatrick continued to refrain from practicing medicine in Arizona, until July 1st.

Being anxious to open the hospital on or before July 1st so that the promised $10,000 donation would be forthcoming, one of the members of the Hospital Board contacted the Governor of Arizona in regard to Dr. Fitzpatrick's license. Thereafter, about a day or two before July 1st, Mr. Robert Carpenter, the Executive Secretary of the Medical Board in Phoenix, at the request of a member of the Medical Board (who had been contacted by the Governor) telephoned Mr. Harper. In the telephone conversation, Mr. Carpenter told Mr. Harper there was no way that Dr. Fitzpatrick could get a temporary license or permit before

---

1. A.R.S. § 32-1456 " * * * B. A person who practices or attempts to practice medicine or surgery without having a valid recorded license to so practice issued by the board of medical examiners is guilty of a felony."

July 1st. Mr. Carpenter stated the Medical Board was to meet on or about July 16. During the conversation Mr. Harper asked if there were any possibility that the hospital might be opened in time to secure the promised donation. Mr. Carpenter stated that there were several hospitals in the state who had resident staff physicians not licensed in the State of Arizona, and that they were hired and paid by the Hospital Board of Directors. Mr. Carpenter also stated that he did not have authority to "ok" such a procedure.

The Hospital Board president, in the presence of the administrator, told Dr. Fitzpatrick that Mr. Carpenter "gave us the go-ahead signal," and that if the hospital hired Dr. Fitzpatrick, the latter could practice in the hospital. Dr. Fitzpatrick asked whether they should wait for written confirmation, but Mr. Harper assured him this was unnecessary. The Hospital Board hired Dr. Fitzpatrick as a resident physician. Dr. Fitzpatrick then engaged in the general practice of medicine in the hospital in Springerville from July 1 to July 14.

During the course of the usual investigation of Dr. Fitzpatrick's application for an Arizona license, the Medical Board discovered that Dr. Fitzpatrick had been acting as the resident physician in the White Mountain Communities' Hospital. On July 16 the Medical Board held an interview with Dr. Fitzpatrick regarding his application for a license. The interview was reduced to writing. The attorney for the Medical Board, a Special Assistant Attorney General, was present throughout the entire interview. Numerous questions were put to Dr. Fitzpatrick. He frankly admitted he had been practicing medicine in the hospital at Springerville after July 1st. But he explained he had done so because he had been assured by Hospital Board members that the Medical Board Executive Secretary said it was all right to do so as a resident physician until his license came through.

The Medical Board told Dr. Fitzpatrick that his application would be denied at that time solely on the basis of his practicing at Springerville without a license. He agreed he would no longer practice in Arizona and would have to return to New Mexico. During the course of the discussion Dr. Fitzpatrick was told the Medical Board had been advised it was their duty to report to the County Attorney the commission of a felony (violation of § 32-1456, supra). The Medical Board told Dr. Fitzpatrick that he could withdraw his application but, if he did not, he would be cited for unprofessional conduct. Dr. Fitzpatrick refused to withdraw the application and the Medical Board thereafter formally cited him to appear before them to show cause why his application should not be denied, pursuant to § 32-1452 A.R.S. He was charged with being guilty of unprofessional conduct in

that he had engaged in the practice of medicine without a valid recorded license to do so.

A hearing was had before the Board of Medical Examiners on October 14, 1960. Dr. Fitzpatrick, Mr. Harper, Mr. Vandiver, and Robert Carpenter testified. There was no substantial conflict in the testimony of any of the witnesses. Harper maintained that although the Secretary of the Medical Board, Carpenter, had said he had no authority to approve the hiring of an unlicensed resident physician by the Hospital Board, Carpenter had made the suggestion that this was a practice in other hospitals in the State, and, therefore, Harper felt the way had been cleared for the Hospital Board to hire Dr. Fitzpatrick and open the hospital and "still stay within the law." Mr. Carpenter admitted that he had talked with Mr. Harper, and had told Mr. Harper that Dr. Fitzpatrick's application and credentials were in order although the Board was routinely investigating the matter regarding a regular license. He further stated that he had mentioned the practice of several Arizona hospitals hiring house staff physicians, but had stated there was some question as to the legality of the practice and that the Medical Board could not suggest or recommend such practice but such decision "must be that of the Hospital Board and it must assume full responsibility therefor."

Dr. Fitzpatrick again confirmed that Mr. Harper had hired him and had told him that the way had been cleared for him to act as resident physician in the hospital although he had not yet received an Arizona license. Dr. Fitzpatrick freely admitted that he had practiced medicine as the resident physician in the hospital under these circumstances. However, it was his position that he relied on the Hospital Board's assurance that this procedure had been cleared with the Executive Secretary of the Medical Board, as entirely legal, and that he believed his license would be forthcoming on July 16th. He knew that he had not been promised an Arizona license, but his papers were in order and he supposed that it would be issued.

The Board of Medical Examiners formally denied the issuance of a license to Dr. Fitzpatrick in the following language:

"It is the findings of this Board that said JOHN EDWARD FITZPATRICK, M.D. is guilty of unprofessional conduct *in that he is guilty of practicing medicine without possessing a valid recorded license of this state in violation of Section 32–1456 A.R.S.* and it is therefore ordered that the application of JOHN EDWARD FITZPATRICK, M. D. to practice medicine and surgery in the State of Arizona be denied." (Emphasis supplied.)

It is the position of the appellant that the Medical Board in determining what constitutes unprofessional conduct, is restricted to the definitions set out by the Legislature in § 32–1401 A.R.S.[2]

It is obvious that only subparagraph (l) could be applicable in determining unprofessional conduct in this case. Appellant claims that it is not applicable, and cites Aiton v. Board of Medical Examiners, 13 Ariz. 354, 114 P. 962, L.R.A.1915A, 691 (1911), as authority for the definition of "unprofessional conduct". However, the Aiton case was decided before a legislative definition of the words "unprofessional conduct", and therefore has no application here.

■ Appellant contends that because the Legislature preceded subparagraph (l) by an enumeration of specific acts of conduct constituting unprofessional conduct, we should apply the rule of ejusdem generis in interpreting the general words used in subparagraph (l), to the end that the general words would apply only to the same general nature and class as the preceding specific enumerations. We do not agree. Such a rule is merely a device for ascertaining the true meaning of the Legislature when it is not clear. Ackerman v. Boyd, 74 Ariz. 77, 244 P.2d 351 (1952). Subparagraph (e) clearly enumerates two separate and distinct items of unprofessional conduct, i. e., (1) "[a]ny conduct or practice contrary to recognized standards of ethics of the medical profession" and (2) "any conduct or

2. A.R.S. § 32–1401:
"1. * * *
"2. 'Unprofessional conduct' includes:
"(a) Procuring, or aiding or abetting in procuring a criminal abortion.
"(b) Wilful betrayal of a professional secret.
"(c) Advertising medical business which is intended or has a tendency to deceive the public or impose upon credulous or ignorant persons, and so be harmful or injurious to the public morals or safety.
"(d) Advertising any medicine or any means whereby the monthly period of women can be regulated or the menses re-established if suppressed.
"(e) Conviction of an offense involving moral turpitude, in which case the record of such conviction shall be conclusive evidence.
"(f) Giving or receiving rebates.
"(g) Habitual intemperance in the use of alcohol or narcotic drugs.

"(h) Personation of another licensed practitioner of medicine and surgery of a like or different name.
"(i) Having professional connection with or lending one's name to an illegal practitioner of medicine or any of the healing arts.
"(j) Gross malpractice resulting in death of a patient.
"(k) Fraudulent representation that a manifestly incurable condition of sickness, disease or injury of a person can be permanently cured, or that a curable condition of sickness, disease or injury can be cured within a stated time if such is not a fact.
"(l) Any conduct or practice contrary to recognized standards of ethics of the medical profession or any conduct or practice which constitutes a danger to the health, welfare or safety of a patient or the public."

practice which constitutes a danger to the health, welfare or safety of a patient or the public."

There was no evidence at the hearing on October 14, 1960, of any conduct or practice on the part of Dr. Fitzpatrick which constituted a danger to the health, welfare, or safety of a patient or the public. Therefore the findings of the Medical Board were based solely upon the premise the conduct of Dr. Fitzpatrick was "contrary to recognized standards of ethics of the medical profession." The Medical Board specifically found that the conduct in question was the violation of § 32–1456, supra. While there is no specific finding to the effect that a doctor who violates the law is guilty of unprofessional conduct, the implication that this is a standard of unprofessional conduct is obvious. Certainly we would agree that as a *general* standard this criterion could and should be applied in every profession in the interests of good citizenship.

█ A professional board, authorized to pass upon qualifications of applicants for a license to practice the profession, however, is not a court for determination of guilt or innocence of an alleged crime. Proceedings before such a board are not required to conform in every respect to those controlling in strictly judicial proceedings. State Board of Technical Registration v. McDaniel, 84 Ariz. 223, 326 P.2d 348 (1958). In a criminal trial, the issue is to determine the guilt or innocence of the defendant in the commission of a specific crime. While ordinarily a criminal intent must exist in order to support the conviction of a crime, it is also true that the Legislature may enact a law making certain conduct a crime in the absence of a criminal intent. Borderland Con. Co. v. State, 49 Ariz. 523, 68 P.2d 207 (1937). Such a law is designated malum prohibitum and the mere doing of the act prohibited constitutes the crime. Section 32–1456 is such a law. Although extenuating circumstances would be no legal bar to conviction, they would certainly be important factors in determining a penalty, and might even warrant granting of probation.

█ We are of the opinion that a professional board, authorized by statute to pass upon qualifications for licensing, should be no less hesitant to take into consideration extenuating circumstances which may exist when an applicant for license has committed a legal offense. In the present case, the evidence presented before the Board was (1) that Dr. Fitzpatrick did practice medicine without having secured an Arizona license; (2) that he purposely refrained from general practice, confining his practice to the hospital; (3) that he believed the Hospital Board had secured an official opinion that such practice was legally permitted; (4) that the source of such opinion was the Medical Board's own Executive Secretary; (5) that even if the Executive Secretary did not actually au-

**316**

thorize Dr. Fitzpatrick to engage in practice at the hospital as a "resident physician" the Secretary's telephone conversation justified the Hospital Board and Dr. Fitzpatrick in believing they would not be violating the law by such conduct. Such circumstances do not constitute a legal defense to the criminal charge of violation of § 32–1456, supra. But they do demonstrate a lack of intent to violate the law. While we cannot say the Hospital Board and Dr. Fitzpatrick were entrapped, certainly the evidence strongly indicated the doctor was induced into a course of action in reliance on what he believed were assurances from the recognized agent of the official board of his own profession.[3]

Under such circumstances, we believe there was not sufficient material and substantial evidence in view of the entire record to support the findings of the Medical Board that Dr. Fitzpatrick was guilty of unprofessional conduct merely because there was technical violation of § 32–1456. We further believe that the decision to deny a license to Dr. Fitzpatrick upon such evidence was arbitrary.

3. Cf. State ex rel. Williams v. Whitman, 116 Fla. 196, 156 So. 705, 95 A.L.R. 1416 (Fla.1934), wherein dental board revoked license of dentist on ground of violation of statute. The statute had been declared unconstitutional by a circuit court when the alleged violation occurred. Florida Supreme Court later reversed, holding the law valid. Held, in reversing dental

The judgment of the superior court affirming the order of the Board of Medical Examiners is reversed. The Board of Medical Examiners is directed to reinstate the application of Dr. Fitzpatrick for consideration without reference to the charge of unprofessional conduct based upon the purported violation of § 32–1456 involved.

UDALL, C. J., and STRUCKMEYER, BERNSTEIN and JENNINGS, JJ., concur.

board: That for a dentist to "be guilty of" violation of law as to subject his license to revocation, there must be a "conscious and culpable act amounting to a willful design to do that which is denounced as unlawful professional practice" and not an act done in recognition of supposed correctness of judicial decision that such an act was lawful.