STATE ex rel. John ASHCROFT, Attorney General of Missouri, and the Missouri Clean Water Commission, Appellant,

v.

Herman J. MATHIAS, d/b/a Mathias Townhouse Apartments, Respondent.

No. 42150.

Missouri Court of Appeals,
Eastern District,
Division No. 1.

May 19, 1981.

Steven Scott Clark, Asst. Atty. Gen., Jefferson City, for appellant.

Earl R. Blackwell, Hillsboro, for respondent.

DOWD, Judge.

The State of Missouri on the relation of the Attorney General and the Missouri Clean Water Commission brought this action against Herman J. Mathias for alleged

violations of the Missouri Clean Water Law, Section 204.006 *et seq.*, RSMo 1978.[1] Mathias was charged with (1) discharging water contaminants into waters of the state in excess of permit limitations and (2) failing to file quarterly monitoring reports with the Missouri Clean Water Commission. The trial court heard evidence in this cause on May 16, 1979, and subsequently entered judgment for respondent-Mathias from which the state has appealed. The trial court concluded that respondent did not cause or permit the discharge of contaminants as alleged by the state. The trial court also concluded that there must be evidence of notice, knowledge, willfulness or negligence on the part of the accused, or the statute would constitute an unconstitutional deprivation of property without due process. The state's application for injunctive relief and penalties was denied and the cause was dismissed.

Respondent is the owner and the developer of the Mathias Townhouse Apartments in Arnold, Missouri. This multi-unit residential complex was constructed in 1972. The waste water generated from the complex was originally treated by a three stage lagoon system, but the Missouri Clean Water Commission later directed respondent to replace that system with a sewage treatment plant. Respondent hired an engineer who formulated plans and specifications for the plant which were approved by the state. Respondent, after being issued a construction permit, purchased and installed a state-approved sewage treatment facility.

On April 11, 1975, the Missouri Clean Water Commission issued respondent a National Pollution Discharge Elimination System permit for the treatment facility. The permit specified certain limitations on the effluent which was to be discharged from the plant into a nearby stream named Muddy Creek. The limitation for the biochemical oxygen demand was thirty milligrams per liter and the limitation for suspended solids was also thirty milligrams per liter.

In addition, the permit required monthly measurement of various standards and for self-monitoring reports to be submitted to the Missouri Department of Natural Resources on a quarterly basis with the first report due on July 10, 1976. Respondent then hired a Mr. Brooks to operate and maintain the treatment facility. Brooks was licensed by the state in the operation of sewage treatment facilities.

The Missouri Department of Natural Resources visited the treatment facility on two occasions in response to complaints from the City of Arnold Health Department. On August 26, 1976, an environmental specialist with the Department observed that the treatment facility was not operating because there was no electricity to run the plant. The stream above the treatment facility's point of discharge was clear, but where the effluent entered the stream it was very cloudy and malodorous. There were pieces of toilet paper and fecal matter in the effluent being discharged into the stream. The trial court found that the waste water treatment plant had been inoperative from August 13 to August 26, 1976, because the electrical service had been disconnected due to respondent's nonpayment of his electric bill. Another employee of the Department visited the facility on August 19, 1977. The stream receiving the plant's effluent was again described as very clear above the discharge point, but became gray and malodorous below the discharge.

The Missouri Department of Natural Resources took numerous samples of the effluent discharged from the treatment facility and measured the biochemical oxygen demand and the suspended solids from each. The trial court found that for a period ending in August, 1978, respondent's permit standards were not maintained for a total of twenty-one days.[2] The trial court also found that the quarterly self-monitoring reports were not filed by Mr. Mathias as permittee with the state as required.

---

1. All statutory references are to RSMo 1978.

2. Measurement of the biochemical oxygen demand and the suspended solids found in the

samples taken by the state showed that respondent's permit standards were often exceeded by two hundred to three hundred percent.

There was expert testimony from Robert Zeman, a sanitary engineer with the Missouri Department of Natural Resources, concerning the operation and maintenance of respondent's sewage treatment facility. The facility was an extended aeration treatment plant. Over a period of time solids accumulated within the plant and had to be removed to maintain efficient waste treatment. Assuming that the sewage was normal sanitary sewage, Zeman concluded that there was no reason that the plant should not operate effectively and meet the permit standards.

The trial court found that respondent's first operator apparently had not maintained the operation of the sewage treatment system at optimum standards at all times. Respondent testified that the operator was to send the self-monitoring reports to the state and give him a copy. There is nothing in the record to indicate whether respondent did or did not receive such reports or whether they were ever compiled. Respondent acknowledged that things grew progressively worse with respect to the first operator's maintenance and operation of the treatment facility and with complaints from the state concerning the system. Respondent discharged the first operator and hired Shaaban Ben-Poorat in August, 1978 to operate the facility. Ben-Poorat noted that when he first visited the facility the aeration tank in the plant contained scum and grease which had to be removed. The valves to the aeration tank had corroded shut and had to be opened.

Respondent testified that he did not know anything about the operation of the sewage treatment facility. He had been very cooperative in dealing with both operators. During the first six months of Ben-Poorat's operation of the plant the effluent discharged into Muddy Creek still exceeded the permit limitations. Ben-Poorat, who also had a state license, stated that he was doing everything he could to cause the plant to operate effectively. He stated that the plant was designed to meet the permit limitations, and if maintained, it should do so. Respondent testified that for the first quarter of 1979, the treatment facility was operating below the permit standards.

As noted above, the trial court found that respondent's permit standards were not maintained for a total of twenty-one days and the self-monitoring reports required by the permit were not filed with the state. The trial court concluded, however, that respondent did not cause or permit the discharge of contaminants into waters of the state in violation of the Missouri Clean Water Law because he installed the state-approved treatment facility, hired state-licensed operators and replaced one when that operator failed to perform adequately, and responded to the directives, complaints and notices of the Missouri Clean Water Commission. Respondent was also found not to have violated the Missouri Clean Water Law with regard to the filing of the self-monitoring reports.

Respondent was charged with violating sections 204.051 and 204.076 of the Missouri Clean Water Law. Section 204.051.1(3) states, in part, that it is unlawful for any person "to discharge any water contaminants into any waters of the state which exceed effluent regulations or permit provisions as established by the commission or required by any federal water pollution control act." Concerning the filing of self-monitoring reports, section 204.051.5 provides that an applicant for a permit may be required to conduct tests, monitor effluents, establish and maintain records and make reports. The acts proscribed by the Missouri Clean Water Law and the relief available for violations are specified in section 204.-076. Section 204.076.1 provides:

" . . . It is unlawful for any person to cause or permit any discharge of water contaminants from any water contaminant or point source located in Missouri in violation of sections 204.006 to 204.141, or any standard, rule or regulation promulgated by the commission. In the event the commission or its executive secretary determines that any provision of sections 204.006 to 204.141 or standard, rules, limitations or regulations promulgated pursuant thereto, or permits issued by, or any final abatement order, other order, or determination made by the commission or the executive secretary, or any filing requirement under sections 204.006 to 204.-

141 or any other provision which this state is required to enforce under any federal water pollution control act, is being, was, or is in imminent danger of being violated, the commission or executive secretary may cause to have instituted a civil action in any court of competent jurisdiction for the injunctive relief to prevent any such violation or further violation or for the assessment of a penalty not to exceed ten thousand dollars per day for each day, or part thereof, the violation occurred and continues to occur, or both, as the court deems proper. . . ."

In enacting the Missouri Clean Water Law the legislature recognized the potential threat of water pollution to the public health and welfare and to other legitimate uses of water and stated:

"[I]t is hereby declared to be the public policy of this state to conserve the waters of the state and to protect, maintain, and improve the quality thereof for public water supplies and for domestic, agricultural, industrial, recreational and other legitimate beneficial uses and for the propagation of wildlife, fish and aquatic life; to provide that no waste be discharged into any waters of the state without first receiving the necessary treatment or other corrective action to protect the legitimate beneficial uses of such waters and meet the requirements of the Federal Waste Pollution Control Act as amended; to provide for the prevention, abatement and control of new or existing water pollution; and to cooperate with other agencies of the state, agencies of other states, the federal government and any other persons in carrying out these objectives."

Section 204.011.

The Missouri Clean Water Law has been found to be "ensconced in a broad, pervasive legislative intent to keep the 'waters of the state' free of 'pollution' from external causes and sources." *State ex rel. Ashcroft v. Union Electric Co.*, 559 S.W.2d 216, 221 (Mo.App.1977). An integral element in achieving some measure of control over

water pollution is the enactment of a permit system to regulate the discharge of pollutants into the waters of the state. As one commentator has noted, permit systems facilitate the collection of necessary information; provide an opportunity to prevent rather than merely abate pollution; and allow a potential polluter to obtain a determination that proposed control devices will suffice before making an investment in them. "State Pollution Statutes." 48 *U.Chi.L.Rev.* 27, 65 (1981).

The trial court found that respondent's permit standards were not met for twenty-one days and the self-monitoring reports were not filed. We believe the state has proven respondent violated the relevant provisions of the Missouri Clean Water Law despite the steps he took to comply with the standards established for his waste water treatment facility. Initially, we note that merely because respondent's construction plans were approved by the state and he purchased a state-approved treatment system he is not excused from future compliance with state pollution requirements in the operation of that system. Nor can respondent disclaim liability in the instant case on the ground that the violations of the Missouri Clean Water Law may have been attributable in some degree to respondent's privately employed operator. To allow respondent to avoid liability by delegating responsibility for the operation and maintenance of his treatment facility to a third party would frustrate the purpose and limit the effectiveness of the Missouri Clean Water Law.

■ Respondent was charged with discharging water contaminants in excess of his permit provisions in violation of sections 204.051.1(3) and 204.076.1. These provisions do not expressly or impliedly indicate that there must be a showing that the accused omitted or committed the proscribed act intentionally or knowingly. These provisions of the Missouri Clean Water Law are *malum prohibitum*, and the state is not required to prove intent or knowledge on the part of the accused.[3] Nor do these

3. *See generally Phillips Petroleum Co. v. Illinois Environmental Protection Agency,* 72 Ill.

App.3d 217, 28 Ill.Dec. 453, 390 N.E.2d 620 (1979); *Freeman Coal Mining Corp. v. Illinois*

statutory provisions seek to proscribe only willful or negligent acts causing pollution of the waters of the state. These conclusions are consistent with other provisions of the Missouri Clean Water Law. Thus, section 204.076.3 provides for the possibility of more severe punishment, including imprisonment, for one who willfully or negligently commits any violation set forth in 204.076.1. The only exceptions to liability for violating the provisions of sections 204.006 to 204.141, or any standard, rule, limitation or regulation adopted thereto, are for violations caused by an act of God, war, strike, riot, or other catastrophe. Section 204.076.-4.

■ In the present case respondent owned a sewage treatment facility to treat the waste water generated from the Mathias Townhouse Apartments. Respondent was issued a permit by the state to discharge waste water into a nearby stream. This permit specified certain standards for the effluent being discharged. The state showed that the effluent being discharged from respondent's treatment facility exceeded his permit limitations. The state also showed that the quarterly self-monitoring reports required by respondent's permit were not filed. These acts clearly constituted violations of sections 204.051 and 204.076 of the Missouri Clean Water Law. We therefore hold that respondent has violated the aforesaid provisions of the Missouri Clean Water Law as charged.

Respondent's motion to dismiss this appeal on the ground that the state's brief did not contain a fair and concise statement of the relevant facts is denied.

For the foregoing reasons, the judgment is reversed and cause remanded for entry of judgment in favor of the state and for further proceedings including consideration of the state's application for injunctive relief and penalties.

STEPHAN, P. J., and STEWART, J., concur.

Pollution Control Bd., 21 Ill.App.3d 357, 313 N.E.2d 616 (1974); State v. Arizona Mines Supply Co., 107 Ariz. 199, 484 P.2d 619 (1971); National Wood Preservers v. Commonwealth, 489 Pa. 221, 414 A.2d 37 (Pa.1980); State v. Kinsley, 103 N.J.Super. 190, 246 A.2d 764 (N.J. Cty.Ct., 1968), aff'd 105 N.J.Super. 347, 252 A.2d 224 (N.J.Super.1969), American Plant Food Corp. v. State, 587 S.W.2d 679 (Tex.Cr. App.1979); State v. Gastown, Inc., 49 Ohio Misc. 29, 360 N.E.2d 970 (1975).